**Juan G. MORALES, Plaintiff,**

v.

**Wilbur J. SCHMIDT, Defendant.**
**No. 71-C-29.**

United States District Court,
W. D. Wisconsin.
April 6, 1972.

Paul Hahn, Madison, Wis., for plaintiff.

Mary V. Bowman, Asst. Atty. Gen., Madison, Wis., for defendant.

JAMES E. DOYLE, District Judge.

This is a civil action for injunctive relief. Jurisdiction is based upon 28 U.S.C. § 1343(3) and 42 U.S.C. § 1983. Plaintiff has been granted leave to proceed *in forma pauperis*.

In his complaint, plaintiff alleges that he is presently confined in the Wisconsin State Prison; that the defendant is the Secretary of the Department of Health and Social Services of the State of Wisconsin; that the defendant has general supervision over the rule-making policies of the prison and that he is "directly liable for the conduct and actions of his agents therein"; that plaintiff wrote a letter to the sister of his wife Sandra; that the name of the sister-in-law was on his approved correspondence list at the time; that the letter was intercepted by his social worker, an agent of the defendant, read by the social worker, and neither mailed to the sister-in-law nor returned to plaintiff; that after the interception of plaintiff's letter, defendant caused the name of the sister-in-law to be removed from the list of plaintiff's approved correspondents; that plaintiff seeks to resume correspondence with the sister-in-law; and that, by virtue of defendant's action, plaintiff is unable to write to her. Plaintiff seeks an injunction requiring the defendant to replace the sister-in-law's name on his approved correspondence list.

Plaintiff has moved for a temporary restraining order to bar the defendant and his agents from preventing him from corresponding with "his relatives and family as said in the complaint."

Defendant has not answered the complaint, but has responded to the motion for a temporary restraining order and has moved for summary judgment dismissing the action with prejudice. The motion is supported by an affidavit of the warden of the prison, to which are attached the disputed letter from the plaintiff to his sister-in-law and certain related prison memoranda. In response to the motion, plaintiff's counsel has filed an affidavit by counsel, to which is attached a copy of a letter written by plaintiff to his counsel subsequent to the filing of defendant's motion for summary judgment.

Based upon the entire record, I find that there is no genuine issue as to the material facts alleged in the complaint and summarized above. I find also that there is no genuine issue as to the following material facts: In the course of reading the disputed letter, and from an ensuing conversation with the plaintiff, the prison administrators acquired reasonable cause to believe that the plaintiff was the father of an illegitimate child born to his sister-in-law; that the child was born while the plaintiff was married to Sandra; that plaintiff remained married to Sandra at the time the disputed letter was written; that Sandra was unaware that plaintiff was the father of her sister's child; and that by corresponding with Sandra's sister, plaintiff desired to preserve his illicit relationship with her, while also intending to live with Sandra and their children following his release. I find also that there is no genuine issue as to the material fact that the prison administrators' decision not to mail the disputed letter to the sister-in-law and their decision to remove her name from the approved correspondence list were based upon their opinion that plaintiff should not be permitted to correspond with a woman with whom he had had an illicit sexual relationship and with whom they believe he intended to persevere in this relationship following his release from prison. Finally, I find that there is no genuine issue as to the material facts that the crime for which the defendant was imprisoned was possession of heroin; and that the letter in question was returned to the plaintiff after

the prison officials had held it for more than two weeks.

█ Defendant contends that he is responsible only for the general administration of the Department and not "for the day to day enforcement of regulations" of the prison. This assertion is made in the brief of counsel for the defendant, and is not supported by affidavit or other proofs. I conclude that the complaint adequately alleges that, for the purpose of an action for injunctive relief as contrasted with an action for damages, the defendant Schmidt, by virtue of his supervisory function, is responsible for the actions of his agents which are the basis of the complaint; no pleading denies the allegation. Injunctive relief against this defendant and his agents would be an efficacious remedy for plaintiff's grievance. Schnell v. City of Chicago, 407 F.2d 1084, 1086 (7th Cir. 1969).

This is but one of a flood of constitutional lawsuits by prisoners. These suits have heavily burdened correctional authorities by requiring them to gather and to organize factual information for court pleadings, and to appear occasionally in court. The federal courts are also heavily burdened by this radical addition to their caseloads, and the absence of plaintiffs' counsel in most cases and the physical restraints upon the plaintiffs frequently render judicial administration unusually difficult. Many of these suits by indigent prisoners are wholly without merit under any view of the facts or the law; many are mischievous; some malicious. The plaintiffs are uninhibited by financial pressures. For many of these plaintiffs, that the very bringing of the suits in such numbers creates a serious problem for correctional authorities and the courts is a matter of indifference, and, perhaps, of wry satisfaction.

The courts have been resistive. "Lawful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system." Price v. Johnston, 334 U.S. 266, 285, 68 S.Ct. 1049, 1060, 92 L.Ed.2d 1356 (1948). Frequently rejection of a prisoner's challenge is expressed in terms of judicial deference to correctional administrators. "Inmates of State penitentiaries should realize that prison officials are vested with wide discretion in safeguarding prisoners committed to their custody. Discipline reasonably maintained in State prisons is not under the supervisory direction of federal courts." United States ex rel. Morris v. Radio Station WENR, 209 F.2d 105, 107 (7th Cir. 1953). See United States ex rel. Knight v. Ragen, 337 F.2d 425, 426 (7th Cir. 1964). See [Cruz v. Beto,] United States Supreme Court, March 20, 1972, 405 U.S. 319, 92 S.Ct. 1079, 31 L.Ed.2d 263 (dissenting opinion of Mr. Justice Rehnquist). " . . . [I]t is not the function of the courts to superintend the treatment and discipline of prisoners in penitentiaries, but only to deliver from imprisonment those who are illegally confined. Stroud v. Swope, 187 F.2d 850, 851 (9th Cir. 1951)."

█ If this negative view were absolute, and if it were controlling upon federal district courts today, it would be rather easy to decide the present case. But the view was never absolute ("limitation of *many* privileges and rights," Price v. Johnston, *supra*; "*wide* discretion" and "discipline *reasonably* maintained," United States ex rel. Morris v. Radio Station WENR, *supra*), and its negativism is not controlling today. "Cruel and unusual punishments," of course, may not be inflicted. But even beyond the Eighth Amendment, it is clear that prisoners enjoy many constitutional protections. " . . . (A)lthough the rights of a person serving a valid state sentence of imprisonment are greatly limited, he does have some federally protected rights which he may redress by a sec. 1983 action against those who have custody of him." United States ex rel. Campbell v. Pate, 401 F.2d 55, 57 (7th Cir. 1968). These rights definitely include: some degree of assistance in the preparation of legal pleadings and papers, Johnson v. Avery, 393 U.S. 483, 89 S.Ct. 747, 21 L.Ed.2d 718

(1969); access to a certain minimum of legal books and materials, Younger v. Gilmore, 404 U.S. 15, 92 S.Ct. 250, 30 L.Ed.2d 142 (1971); protection from racial segregation within a prison, at least in the absence of unusual circumstances, Lee v. Washington, 390 U.S. 333, 88 S.Ct. 994, 19 L.Ed.2d 1212 (1968); and the equal protection of the laws with respect to religious beliefs, Cooper v. Pate, 378 U.S. 546, 84 S.Ct. 1733, 12 L. Ed.2d 1030 (1964), and Cruz v. Beto, United States Supreme Court, March 20, 1972, 405 U.S. 319, 92 S.Ct. 1079, 31 L. Ed.2d 263. Although the holding in Haines v. Kerner, January 13, 1972, 404 U.S. 519, 92 S.Ct. 594, 30 L.Ed.2d 652, is not wholly clear, it seems to be that a state prisoner states a cause of action under § 1983 when he alleges that he suffered aggravation of preexisting physical ailments by reason of certain conditions of confinement and that there was an absence of procedural due process with respect to the imposition of a disciplinary measure within the prison. Many other federal constitutional rights of state prisoners have been recognized and protected by federal courts of appeals and federal district courts, and some federal district courts have considered it necessary to provide broad injunctive relief to vindicate such rights. See Sostre v. Rockefeller, 312 F.Supp. 863 (S.D.N.Y. 1970), reversed, modified, and affirmed in parts, Sostre v. McGinnis, 442 F.2d 178 (2d Cir. 1971); Clutchette v. Procunier, 328 F.Supp. 767 (N.D.Cal. 1971); and Landman v. Royster, 333 F.Supp. 621 (E.D.Va.1971).

In all this, I find virtually no guidance to a federal district court today in its effort to decide whether the Fourteenth Amendment forbids a state [1] to regulate the life of a prisoner in the specific manner challenged in the lawsuit. To say that the federal courts should generally defer to the judgment of administrators of state correctional facilities, or to say, on the other hand, that inmates of state prisons enjoy some degree of protection from the Fourteenth Amendment, is to express an attitude but little more. I discover in the cases scarcely a single beam or joist in a framework of principles within which a particular constitutional challenge to a particular prison regulation can be decided.

I make this observation with respect and sympathy for my brother judges, and particularly my brother federal district judges. Like them, keenly conscious of my limitations, I have temporized in these prisoner cases. I have sought bases of decision which leave undisturbed the profound issues lurking so closely beneath their surface. I have hoped vaguely that pragmatic case-by-case dispositions by all of the courts, trial and appellate, would result reasonably promptly in the development of the necessary framework of principles. But this hope, vindicated so often in the growth of the law and perhaps again to be vindicated in the context of these prisoner lawsuits, is unconsoling. I cannot decide case number one without some framework, however crude and tentative. To erect even a few beams and joists of the framework tests a judge's grasp of history, awareness of present reality, psychological insight, and practical wisdom so severely as to prompt sensations of despair. But the necessity that the cases be decided forbids despair.

My estimate of the profundity of the problem may be considered extravagant. I think not. In my view, the intrinsic importance of these constitutional challenges to the prison system is immense, and the conceptual difficulty of deciding them extreme.

With respect to the intrinsic importance of the challenges, I am persuaded that the institution of prison probably must end. In many respects it is as intolerable within the United States as was the institution of slavery, equally brutalizing to all involved, equally toxic to the social system, equally subversive of the brotherhood of man, even more costly by

---

1. In this opinion, I leave unexpressed its implications for federal prisons, and for federal district judges who sentence defendants to federal prisons when not engaged in deciding what the Fourteenth Amendment means for state prisons.

some standards, and probably less rational. The immediate question for the courts, while prisons continue to exist, is how to respond to them in terms of constitutional litigation: whether to support the institution but to shape it, or to end it, or to be neutral with respect to its continued existence. This question is urgent because, whether or not so intended, a certain pattern of judicial response to these lawsuits may set in motion a dynamic process of disintegration of the institution.

With respect to the conceptual difficulty of the cases in constitutional terms, this very opinion will demonstrate its severity, at least for me.

Mindful that the journey's end may well be determined the moment the starting point is chosen, I choose this starting point: Until and unless one is convicted of a crime, one shares with the general population[2] the full latent protection of the Fourteenth Amendment. I emphasize "convicted." I suppose that if government were omniscient, a line might be drawn between those who have committed crimes and those who have not. But government is not omniscient and so a line is drawn between those who have been identified as having committed a crime (that is, those who have been convicted) and those who have not been so identified.[3] It has been thought that the latent protection afforded the general population by the Fourteenth Amendment is denied in whole or in part to those convicted of crime; that conviction is the River Styx; that its distant shore is a land in which the light of the Fourteenth Amendment shines dimly if at all.

My thesis is that those convicted of crime should continue to share with the general population the full latent protection of the Fourteenth Amendment.

### Equal Protection of the Laws

The state draws a line between a class of persons who have not been convicted of a crime and a class of persons who have been convicted of a crime. Within the latter group, it seems clear that the equal protection of the laws is operative: black prisoners may not be dealt with more harshly than white, simply because they are black; nor Christian prisoners more favorably than Muslim, simply because they are Christian. In this sense, those convicted of crime do continue to share with the general population the full latent protection of the equal protection clause of the Fourteenth Amendment.

A much more difficult problem relates to distinctions in the manner in which the state may treat the members of the two major classes: (a) those who have not been convicted of a crime; and (b) those who have been convicted of a crime. Clearly, the equal protection clause governs the process by which the membership of the two classes is determined. Thus, the state may not limit conviction of crimes to those who are black or Christian or poor, simply because they are black or Christian or poor. But once the membership of the two classes has been determined, there seems to be a view abroad, unarticulated but potent, that the equal protection clause no longer applies to governmental treatment which distinguishes one from the other. I do not share this view.

2. I appreciate that within the "general population" are members of the armed forces, students in public schools, recipients of public welfare payments, government employees, and others whose relationship to government may be characterized as "special." Like those who have been convicted of crime, members of these other groups have also engaged in recent years in new and insistent challenges to governmental treatment of them.

For the purpose of this opinion, however, I use the term "general population" to describe those who have not been convicted of crime and whose relationship to government is not "special."

3. Because in this case I am concerned with prisons, I use "crime" to mean an act, following conviction of which one may be imprisoned by a state.

■ I believe that this governmental classification for the purpose of differential treatment should not escape the judicial scrutiny borne by other governmental classifications for the purpose of differential treatment. If a challenge is made to a statute or regulation distinguishing between those convicted of crime and those not convicted of crime, ordinarily the burden will be upon the challenger to show that in the particular context, the distinction is arbitrary and unreasonable. On the other hand, if the distinction between the two classes bears upon an individual interest considered to be "fundamental," such as the expression of ideas or the exercise of religion, then the burden will be upon the government to show a compelling state interest in the differential in treatment.[4]

I anticipate that in the prisoner cases, considerable difficulty will attend the selection of individual interests to be characterized as "fundamental," so as to invoke the requirement that the state show a compelling governmental interest in the regulatory classification. With respect to the general population, such a selection has been made over the years.[5] However, the most striking aspect of prison, in terms of Fourteenth Amendment litigation, is that prison is a complex of physical arrangements and of measures, all wholly governmental, all wholly performed by agents of government, which determine the total existence of certain human beings (except perhaps in the realm of the spirit, and inevitably there as well) from sundown to sundown, sleeping, waking, speaking, silent, working, playing, viewing, eating, voiding, reading, alone, with others. It is not so, with members of the general adult population. State governments have not undertaken to require members of the general adult population to rise at a certain hour, retire at a certain hour, eat at certain hours, live for periods with no companionship whatever, wear certain clothing, or submit to oral and anal searches after visiting hours, nor have state governments undertaken to prohibit members of the general adult population from speaking to one another, wearing beards, embracing their spouses, or corresponding with their lovers. There has been no occasion to test the constitutionality of such measures as applied to members of the general population. New ground must be broken, therefore, in deciding which, if any, of the individual interests affected by such requirements and prohibitions are to be characterized as fundamental.

## Due Process

■ (a) *Procedural.* Obviously, procedural due process must precede the conviction. Whether procedural due process in subsequent situations is wholly to be denied those convicted of crime may be viewed as a manifestation of the equal protection problem. I regard the individual's interest in procedural due process, as a fundamental interest. Therefore, if a statute or regulation undertakes to deny to persons convicted of crime one or more of those elements of procedural due process which must be accorded those not convicted of crime, the burden will be upon the state to show a compelling governmental interest in the differential in treatment.

(b) *Substantive.* I appreciate that controversy persists whether, with respect to the general population, any "substance" as contrasted with "procedure" is encompassed by the due process clause

4. I do not believe that, for whatever purpose the classification may be made, a classification between those convicted of crime and those not convicted of crime could be considered a "suspect" classification, such as a classification based on race or religion.

5. *E. g.,* City of Phoenix v. Kolodziejski, 399 U.S. 204, 90 S.Ct. 1990, 26 L.Ed.2d 523 (1970) (voting); Shapiro v. Thompson, 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed. 2d 600 (1969) (right to travel); Brown v. Board of Education, 347 U.S. 483, 493, 74 S.Ct. 686, 98 L.Ed. 873 (1954) (education); Loving v. Virginia, 388 U.S. 1, 87 S.Ct. 1817, 18 L.Ed.2d 1010 (1967) (marriage).

today; also, whether the "liberty" protected by the due process clause is limited to those ingredients "expressly" catalogued in the Constitution, or whether certain ingredients are implicit in that "liberty." In the prisoner cases these issues are sharply raised, and here too I anticipate considerable difficulty in deciding whether asserted rights to be free of certain restraints upon prisoners are to be characterized as "substantive," as many of them appear to be; whether they are thought to have been catalogued expressly in the Constitution, as they appear generally not to have been; and if they are to be accorded protection by the due process clause, then whether in uniform degree or in varying degrees.

*Elements of unreasonableness or arbitrariness and elements of compelling governmental interests, in prisoners' § 1983 cases*

Depending upon the nature of the individual interest of the prisoner affected by a particular regulation, as I have said, the burden of persuasion may fall upon the prisoner making the challenge or upon the defendant official. Wherever the burden, however, the inquiry will center upon the governmental objective sought and the particular means chosen to achieve it. No doubt it will be contended that the central objective of prison is the protection of members of the general population from loss and injury caused by antisocial behavior. Surely this is a governmental objective which is wholly permissible under the Constitution.[6] The problems arise from the choice of prison as a means to achieve it.

For brevity, I have used the word "prison" throughout this opinion to describe the application of force or the threat of force to confine a person within a certain physical space and to compel obedience to a certain regime within that space. The prisoners' § 1983 suits are typically directed to one or more aspects of the regime within the prison (mail censorship, for example), although occasionally they are directed to the physical arrangements themselves (the size of a cell in a segregation unit, for example), and occasionally to a necessary consequence of any physical confinement (inability to appear in court to defend a divorce action, for example). Much of the discussion which follows immediately will be expressed in terms of constitutional challenges to various aspects of the regime within prison.[7]

Four principal means to achieve the central objective of protection of members of the general population from antisocial behavior are traditionally and commonly asserted to be supplied by prison: (1) physical prevention of antisocial behavior during the period of confinement; (2) deterrence of the prisoner from further antisocial behavior follow-

---

6. I appreciate that public vengeance has been invoked as a justification for the governmental imposition of sanctions, including imprisonment, upon an offender. Less baldly, it has been argued sometimes that vengeance must be exercised by the application of the organized force of the state, lest the thirst for vengeance otherwise be slaked by the action of vigilantes and mobs. If today a legislature were expressly to declare public vengeance to be the sole reason for making a certain act punishable by imprisonment, I doubt that many courts would defer, constitutionally, to the legislative decision. None should, in my view.

7. Obviously, among the states and within a particular state, places of confinement vary widely in terms of the physical

plant, the size and quality of the staff, the nature of the program and regulations within the place of confinement, and the characteristics of the inmate population. Generally speaking, when the legislature prescribes imprisonment as the punishment for a crime, it does not undertake to define imprisonment. Generally speaking, also, when a court sentences a defendant to imprisonment, it does not undertake to define imprisonment. Of course, both legislators and judges are usually generally aware of the nature of the various places of confinement. Typically, however, it is administrators, by regulation, who determine the day to day, month to month, year to year reality which lies within the skin of the word "imprisonment."

ing his release; (3) deterrence of others from antisocial behavior; and (4) rehabilitation of the prisoner. Various prison regulations and programs are thought to implement each of these four means to achieve the central objective.

(1) There can be little doubt that imprisonment is an efficacious means to prevent the prisoner from antisocial acts against the general population during the period of confinement. It is the equivalent of placing a person in legirons and handcuffs. So trussed, the person might be placed in the town square or even at home. But in order to achieve conveniently the equivalent of shackling hundreds or thousands of persons, while easing the hardship of literally employing legirons and handcuffs, offenders can be confined together in buildings and compounds. The specific implementations of this means are simple and straightforward: gates, keys, guards, and regulations designed to prevent escape.

(2) To the extent that imprisonment is distasteful and unpleasant, it is thought that one who suffers it will desire not to suffer it again. When the prisoner is released, he or she will refrain from antisocial acts because this course will avoid the risk of subsequent imprisonment. The specific implementations of this means could be limitless; they could be simple and crude or sophisticated and refined. The Eighth Amendment places some limit upon their cruelty or rarity. Undoubtedly, great difficulty will mark the course of constitutional litigation in which prison regulations are attacked as violations of the equal protection clause and the due process clause, and the defense is raised that the particular regulations implement deterrence as a permissible means to achieve a permissible objective. Clearly, this defense cannot be honored without qualification, since the more miserable life is made within the prison, presumably the more effective the deterrence. Thus, deterrence might be strengthened by a prison regime in which the intensely religious man would be denied access to religious books and services, in which any semblance of fairness would be stripped from disciplinary procedures, in which racial discrimination would be actively practised, and in which homosexual assaults would be encouraged. I am inclined to the view that deterrence can constitutionally justify little more than physical confinement itself and a relatively spartan regime within the prison in terms of the amenities.

(3) If it is generally known that one convicted of crime will be imprisoned, and that imprisonment is distasteful and unpleasant, it is thought that those in the general population will refrain from antisocial acts, because this course will avoid the risk of imprisonment. What has been said in (2), above, concerning the implementation of deterrence as a means, applies as well to this so-called "general deterrence."

(4) The experience of imprisonment, including participation in the program within the prison, it is thought, will alter the prisoner's personality in such a way that following release, he or she will not engage in antisocial acts. This is to be distinguished from (2), above. Here the proposition is that, quite apart from the promptings of fear of suffering another imprisonment, the offender's pattern of behavior following release will differ, favorably, from the pattern of behavior which preceded imprisonment. As in the case of deterrence as a means, so in the case of rehabilitation as a means, the specific implementations could be limitless; they could also be simple and crude or sophisticated and refined; they could reflect any of a number of schools of thought about modification of human behavior; they could be passive; they could be active, including the use of drugs and shock treatment. The effort at rehabilitation could be limited to an attempt to change the prisoner's pattern of behavior with respect to the specific criminal conduct which resulted in the imprisonment, and perhaps other specific criminal conduct which had resulted in convictions in the past. Or it could be expanded in an attempt so to

shape the prisoner's post-imprisonment behavior that wholly distinct antisocial behavior would be avoided.[8] Possibly the greatest difficulty will be encountered in the course of constitutional litigation in which prison regulations are attacked as violations of the equal protection clause and the due process clause, and the defense is raised that the particular regulations implement rehabilitation as a permissible means to achieve a permissible objective. Just as defenses based upon deterrence cannot be honored without qualification, so, it seems to me, defenses based upon rehabilitation cannot be honored without qualification. An attempted constitutional justification of a prison prohibition or requirement solely on the ground that it is considered rehabilitative will require careful scrutiny.[9]

### Measures essential to the existence of prison

I turn to a strange phenomenon which accounts for a major portion of the prisoners' § 1983 lawsuits. Although the contentions have not been articulated in the following way, I understand the correctional officials to argue: The central objective of protection of the general population from antisocial behavior is a constitutionally permissible objective. Physical prevention of antisocial behavior for a period of time, deterrence of the specific offender, general deterrence of others, and rehabilitation are four constitutionally permissible means to achieve the central objective. Various measures and programs to implement these constitutionally permissible means are also constitutionally permissible. Prison is an institution in which the implementation of these means can be achieved. The existence of prison is constitutional. Prison cannot exist without an elaborate network of rules and regula-

tions whose sole purpose is to permit prison to exist. Therefore, this latter network of rules and regulations is constitutional.

It is not contended that these latter rules and regulations, which are often referred to as matters of internal discipline but which I will describe as rules for institutional survival, are intended to serve any deterrent or rehabilitative function; that they serve a deterrent function is fortuitous; I am unaware that they serve any rehabilitative function, fortuitous or otherwise. These rules are intended in major degree to provide protection of the guards and administrators from the inmates; to protect the inmates from one another; and to maintain some kind of internal routine, similar to municipal traffic and health ordinances, and similar to the rules of a monastery with respect to meals and hygiene and noise. Many of them are required by budgetary considerations, which limit available living space and supervisory manpower. Many of them are mild enough and of small significance. But many are abrasive, of much significance in the lives of the prisoners, and productive of litigation. The latter include limitations on visits and on the degree of affection which may be shown during visits; bodily searches following visits; opening incoming and outgoing mail; regulations affecting hair styles; limitation on access to the law library and on the arrangements for conferences with counsel; segregation by sex in the several places of confinement; summary procedures in internal disciplinary proceedings; segregation and solitary confinement; and so on.

Lawsuits challenging these rules for institutional survival raise peculiarly poignant issues. The genuineness of the prisoners' grievances, the humiliating

8. Obviously, this discussion is directed to rehabilitative programs within the prison, whether in the form of negative prohibitions or affirmative measures, which are forced upon the prisoner. I see no constitutional problems in making available counseling, psychiatric services, courses in vocational skills, and educational pro-

grams, which the prisoner may elect to engage in.

9. I leave unexpressed the implications this may have for probation and parole, which represent indirect applications of governmental force to control, and perhaps to alter, patterns of behavior.

and degrading effects of many of the rules, the invasion of the innermost core of human privacy, all compel serious and sympathetic attention to these complaints. The genuineness of the concern of the guards and administrators for their own safety and for the protection of some prisoners from other prisoners, the budgetary frustration experienced by correctional officials keenly aware that many of these rules for institutional survival undercut major objectives of their programs, the obvious proposition that the correctional officials are better qualified than the courts to evaluate the necessity for these rules for institutional survival, all compel serious and sympathetic attention to the answers to these complaints.

In my view, in passing upon these challenges to the rules for institutional survival, the balance must be struck in favor of the individual rights of the prisoners. That is to say, if one of these rules of institutional survival affects significantly a liberty which is clearly protected among the general population, and if its only justification is that the prison cannot survive without it, then it may well be that the Constitution requires that the prison be modified. Specifically, if the functions of deterrence and rehabilitation cannot be performed in a prison without the imposition of a restrictive regime not reasonably related to those functions, it may well be that those functions can no longer be performed constitutionally in a prison setting. Also, with respect to the comparatively few offenders who simply must be physically restrained for periods of time to prevent them from committing antisocial acts, it may well be that the society will be compelled, constitutionally, to allocate sufficient resources for physical facilities and manpower to permit this function of physical restraint to be performed in a setting which little resembles today's prisons.

It seems hardly necessary to say, but perhaps to avoid misunderstanding it should be said, that court decisions in constitutional litigation involving prisons is surely not the best way and is indeed an unsatisfactory way, in which to meet the basic problems posed by the existence of prisons. I am aware that the problem is receiving much intensive study currently both by those who are experienced in correctional administration and by those who are bringing fresh perspectives and insights. I am also aware that changes are occurring. State executives and state legislatures have better means of gathering information and more flexibility in experimenting with new approaches than do the courts in the framework of adversary constitutional litigation. However, in my view, this circumstance does not permit the courts to refrain from acting when a particular prison regulation is challenged on constitutional grounds; to refrain is to decide, for all practical purposes; it is to say to a prisoner-plaintiff that although his constitutional claim may be valid, the courts will allow the defendant officials to deprive him of it. The point is that the constitutional litigation should be avoided or diminished by executive and legislative action [10] which will eliminate the need for it.

### The present case

I conclude that freedom to use the mails is a First Amendment freedom. Odell v. State of Wisconsin Department of Health and Social Serv., 319 F.Supp. 305 (W.D.Wis.1970). I conclude that a member of the general population would be free to correspond by mail with his wife's sister, whether or not he was the father of the sister-in-law's illegitimate child and whether or not he intended to persevere at a later time in a sexual relationship with his sister-in-law. I conclude that in the general population, each individual's interest in corresponding by mail with another is fairly to be characterized as a "fundamental" interest. I conclude that when the government undertakes to deny this freedom to a mem-

10. And perhaps Congressional action. Sec. 5, Amendment XIV, United States Constitution.

ber of the class of persons who have been convicted of crime, while granting it to members of a class of persons who have not been convicted of crime, the burden is upon the defendant to show a compelling governmental interest in this differential in treatment.

■ The government has contended in the present case that two of its interests are at stake.

The first is its interest in the survival of the prison as an institution, which survival depends upon the maintenance of internal prison discipline. As applied to outgoing correspondence from this plaintiff to his wife's sister, the defendant has demonstrated no such compelling governmental interest.

The second governmental interest in this interference with the correspondence is said to be the government's interest in the rehabilitation of the plaintiff. Specifically, it is contended that the defendant's agents were justified in the view that if the correspondence were permitted it would increase the chances that following his release, the plaintiff would engage in criminal activity, namely, proscribed sexual activity with his wife's sister. Presumably, among those who have not been convicted of a crime, there is a certain measure of correspondence by mail between persons who may be expected, with varying degrees of probability, depending upon their past relationships and other factors, to engage in unlawful sexual activity with one another at some future time. The government may be supposed to have an interest in diminishing the likelihood of such future unlawful sexual activity, but it is not permitted to vindicate this interest by interfering with the correspondence by mail. I am not persuaded that the government's interest in diminishing the likelihood of such future unlawful sexual activity by one convicted of a past crime, as contrasted with one not convicted of a past crime, is so compelling as to permit the vindication of this interest by interference with this correspondence by the plaintiff.

■ I find that in denying the plaintiff the opportunity to correspond with his sister-in-law by mail, the defendant and his agents are acting under color of state law, and that they are depriving him, and threaten to continue to deprive him of a right secured to him by the First and Fourteenth Amendments to the Constitution of the United States. I find that unless the defendant and his agents are enjoined from continuing with this practice, the plaintiff will suffer irreparable injury. I conclude that the plaintiff's chance ultimately to prevail in this suit is reasonably good.