**The INMATES OF MILWAUKEE COUNTY JAIL et al., Plaintiffs,**

**v.**

**Alvin PETERSEN, individually and in his capacity as Chief Jailer of the Milwaukee County Jail, et al., Defendants.**

**No. 70-C-545.**

United States District Court,
E. D. Wisconsin.

Jan. 17, 1973.

Corrections Legal Services Program, by Kent A. Martin, Freedom Through Equality, Inc., by Steven H. Steinglass, Wisconsin Civil Liberties Union, by Robert E. Sutton, Milwaukee, Wis., and NAACP Legal Defense and Education Fund, Inc., by Stanley A. Bass, New York City, for plaintiffs.

Robert P. Russell, Corp. Counsel by James J. Bonifas, Deputy Corp. Counsel, Milwaukee, Wis., for defendants.

OPINION

MYRON L. GORDON, District Judge.

This action began on September 29, 1970, as a broad challenge by pretrial detainees to the constitutional propriety of Milwaukee County jail practices and conditions. The scope of the litigation narrowed considerably as the pretrial proceedings progressed, until the following matters remained subject to challenge:

a. Disciplinary procedures in the jail;

b. Limitations on and censorship of incoming and outgoing mail correspondence;

c. Regulation of reading material allowed in the jail; and

d. Restrictions on telephone usage.

Most factual issues were ultimately resolved by stipulation. Trial was held and testimony taken as to those few factual matters not covered by the stipulations. Since completion of the trial, the parties have had the opportunity to submit proposed findings and conclusions and written memoranda in support thereof.

Several preliminary observations would seem appropriate here. First, the issues presented in this case concern the fundamental rights of true pretrial de-

tainees only. It must be borne in mind that these are not people who have been convicted and sentenced to jail; they are persons who have been charged with offenses and are entitled to the presumption of innocence. They are incarcerated solely because of their inability to post bail. Wis.Stats. § 969.01(1) (1969).

█ Second, as individuals who have not been convicted of crime, they retain all rights retained by arrestees who have been released on bail, except for the curtailment of mobility deemed necessary to secure attendance at trial and the limitations necessary to protect the security of the institution in which they are detained. See Coffin v. Reichard, 143 F. 2d 443, 445 (6th Cir. 1944).

█ Third, the nature of the claims and the protection sought under the Constitution properly bring this action before this court under 42 U.S.C. § 1983 and 28 U.S.C. § 1343, its jurisdictional counterpart. Wilwording v. Swenson, 404 U.S. 249, 251, 92 S.Ct. 407, 30 L. Ed.2d 418 (1971). Since those claims involve fundamental civil rights, abstention is not warranted. See McNeese v. Board of Education, 373 U.S. 668, 671–674, 83 S.Ct. 1433, 10 L.Ed.2d 622 (1963).

█ Fourth, I do not believe that the historical reluctance of courts to interfere with the administration of penal institutions should prevent this court from considering the issues raised here. In recent years, there has been an awareness of the fact that if such consideration is not afforded by the courts, it may not be afforded at all. Jones v. Metzger, 456 F.2d 854 (6th Cir. 1972). Consequently, several federal courts have acted in this area. See, e. g., Cruz v. Beto, 405 U.S. 319, 92 S.Ct. 1079, 31 L.Ed.2d 263 (1972); United States ex rel. Campbell v. Pate, 401 F.2d 55, 57 (7th Cir. 1968).

█ Finally, the interests of administrative personnel in establishing policies and procedures which they consider necessary for the achievement of penal goals—ranging from punishment to rehabilitation—are entitled to little consideration here; the legitimate objective of a *pretrial* detention facility is to assure a defendant's appearance at court proceedings. See Wis.Stats. § 969.01(4) (1969).

In light of the foregoing, it becomes necessary to examine the facilities, procedures and policies of the Milwaukee County jail. The claims of pretrial detainees can be properly considered only when the factual picture is measured against constitutional standards.

### FINDINGS OF FACT

The Milwaukee County jail is located within the Safety Building, a structure owned by Milwaukee County, and is composed of nine tiers or floors. The ground level is devoted to reception and discharge of prisoners and houses the prisoner property storage room, commissary, and barber shop. The reception area consists of a booking area, which is a temporary holding area for persons brought in and awaiting booking, and three holding cells, one large and two small. The three holding cells are utilized for temporary detention of inmates, those awaiting booking or assignment to regular quarters. The two small cells are occupied by one or two prisoners. One small cell has no facilities and the other has a toilet, sink and steel benches. The large cell accommodates up to 12 prisoners and contains a toilet, sink, and steel benches.

The first tier is composed of 20 one-man cells divided into two blocks of ten cells each. Each cell measures approximately six feet by nine feet and contains a toilet, washbasin, shelf and a single bunk. Each cell opens into the prisoners' corridor which is paralleled by a guards' corridor divided from it by a steel grill. The two cell blocks are separated by the jailer's office and control center. An iron door leads from the control center to the guard corridor of each cell block.

Tiers 2, 3, 4 and 8 are identical. Each contains ten four-man cells divided

into two cell blocks of five cells each, separated by a deputy's station and two attorney-consultation rooms. Each cell measures approximately nine feet by ten feet and has a concrete floor, steel walls, steel ceiling and steel grillwork at the open end. Each cell contains a toilet and washbasin, shelves and four steel bunks welded to the walls. Each cell block has a prisoners' corridor onto which the individual cells open, and which leads to a day room for the common use of prisoners in the cell block. Tables, benches and a shower area containing a shower stall with curtain, toilet and utility sink are located within the day room. The prisoners' corridor is paralleled by a guards' corridor and is separated from it by a steel grill. The cell blocks are separated from the guard station by an iron door which leads to the guard corridor.

Tiers 5, 6 and 7 consist of single cell blocks containing five four-man cells identical in construction to those described in the preceding paragraph, a guard station and one attorney-consultation room. Tier 7, in addition, contains an infirmary, nurses' office and treatment room, and a multi-purpose room serving as a chapel, auxiliary court room and group therapy room. Each cell block is separated from the guard station by an iron door leading to the guard corridor.

The prisoners' exercise area is located on the roof above the jail. It is a steel-barred enclosure approximately 40 feet by 80 feet. It is accessible by stairway and a single elevator.

The cell blocks described contain a total of 55 four-man cells and 20 one-man cells, providing accommodations for 240 inmates, exclusive of holding areas, infirmary, Huber quarters and trustee quarters. No inmates serve sentences in these quarters. Of those persons incarcerated in the Milwaukee County jail, excluding Huber prisoners and trustees, all are either pretrial detainees awaiting trial but incarcerated because they are unable to post bail or are on transfer from a post-conviction correctional institution, or sentenced prisoners awaiting transfer to a post-conviction correctional institution. The present action is brought by pretrial detainees, and they constitute by far the largest group of the jail's population.

Prisoners other than those located on tiers 1 north and 1 south are released from their cells daily at approximately 6 a. m. and returned to them at 10 p. m. During these hours they have full access to the entire cell block, the prisoner corridor and day room. Prisoners on tier 1 north are convicted state prisoners awaiting other trials or post-conviction hearings and are kept in segregation at the direction of the Division of Corrections. Prisoners in 1 south are in isolation, security risks, homosexuals or narcotic addicts undergoing treatment or detoxification. Individuals not in isolation are released from their individual cells on a one at a time basis for recreation and showers. Aside from this, they enjoy most other privileges in common with other prisoners.

Prisoner privileges normally embrace television viewing, radio listening, reading, correspondence, use of showers, visitation, use of day room and exercise in prisoner corridor or on roof, weather permitting. Games such as checkers, dominoes, chess, jigsaw puzzles, cards and crossword puzzles are provided. Candy, smoking materials and items of personal hygiene are available at the commissary.

After initial processing, inmates are assigned to their specific tiers and cells and given a document entitled "Inmate Property Register", whether they have property or not, as it contains a partial listing of the jail rules. Additional copies of this partial listing are posted in each cell. The rules are stated in general terms and deal with a wide range of activities involved in the operation of the jail. Certain stated rules, in particular those set out under the heading

"Mail", are not the rules and procedures presently being followed by the jail. Except with respect to violations of criminal laws, the partial listing does not contain any specific statement of the punishments which may be imposed for violations other than the vague statement under the heading "Conduct", which provides: "If you fail to conduct yourself properly you may lose privileges which are granted to all prisoners in good standing." It does not contain any description of the disciplinary procedures followed in the event of violations of the rules nor of the rights inmates may have under those procedures. This is the only official notice of the rules and procedures that the inmate ordinarily receives, although the inmate may receive additional information from other inmates or from the jail staff on a verbal basis; however, the availability and content of such information is at the discretion of the individual staff member and its distribution is not the product of any established program for the education of inmates as to the jail's rules and procedures. A more detailed and complete description of the rules, policies and procedures is contained in a document entitled "Rules and Procedures of the Milwaukee County Jail—Revised, 1971", which is available to the staff of the Milwaukee County jail but not to inmates.

Violations of the majority of the internal rules of conduct as set forth in the "Inmate Property Register" and the "Rules and Procedures of the Milwaukee County Jail" constitute minor offenses. Examples of such offenses would be extensive horseplay, failure to maintain cells in a clean condition and to maintain personal hygiene, failure to make beds and to be prepared for court appearances on time, gambling, acts of insubordination and disturbances of other prisoners during sleeping hours. For minor offenses the disciplinary process is as follows:

 a. When the offense occurs the inmate is given written notice on a "Rules Violation" form. This brief form contains: 1) space to insert the date, time, tier, cell and name of the rule violator; 2) a statement that "The Following Conditions Or Conduct Needs Correction at Once. Future Warnings May Result in Disciplinary Action", although the disciplinary action which may be taken remains unspecified; 3) a check list of nine violation categories only two of which, "Possession of Contraband" and "Other", provide for the insertion of additional information; and, 4) the signature of the jail officer.

 b. After the inmate has received a minimum of three such "violation notices", he is brought before a superior officer, usually a jail duty sergeant, for an interview. The individual staff members who issued the notices are generally not present at this interview.

 c. On the basis of the "violation notices" the interviewing officer may, within his discretion, either issue a further warning or temporarily revoke any or all normal privileges. In addition to the forfeiture of normal privileges, the individual may also be restricted to his cell, and, in the case of a repeater, these sanctions may be imposed for long periods of time.

Inmates are not formally notified in advance of the interview-type "hearing". Notice of an interview scheduled for any particular day could be given at the 8:00 A.M. tier deputy shift change on that day. The sole stated reason that formal advance notice is not given is that interview-hearing times are not scheduled but are held on a random "time available" basis; the jail staff are often totally committed to other regular duties which are given greater priority, such as the moving of prisoners to and from court appearances and the performance of courtroom duty.

At the interview the inmate is not permitted counsel or a counsel substitute, and if privately retained counsel

appeared, he would not be permitted to participate. The inmate is not given a copy of the charge other than the "violation notice"; he is not confronted by nor permitted to cross-examine witnesses; no record is kept; no written disposition is made.

State criminal law violations or internal rule violations such as fighting with other prisoners, setting fire to combustibles and flooding cells by plugging drains constitute "serious offenses". Punishments in serious offenses may range from loss of normal privileges through isolation, reduced diet, and loss of all privileges, including restriction of visiting, except for counsel and clergy, and restrictions upon correspondence, except for counsel, clergy and "privileged correspondence". Isolation normally consists of incarceration in one of the single cells and normally does not extend for a period greater than five to ten days. Reduction of diet takes place under a doctor's direction and consists of reduction from the normal diet to usually two sandwiches, two ½ pints of milk, a piece of fruit, and a piece of bakery at each meal. The maximum period of reduced diet is ten days.

For serious offenses the disciplinary process is as follows:

a. A jail deputy files a written report of the incident with his superior officer. A copy of this report is not given to the inmate, and the inmate is given no formal notice that a violation has been alleged or that an investigation may be commenced.

b. Further investigation is made by the superior officer.

c. Serious violations of state criminal laws are referred to the district attorney for prosecution.

d. The investigation report is reviewed with the inmate at an informal hearing attended by the reporting officer and a superior officer. Reports of the incident obtained from other inmates or jail personnel may be considered.

e. The inmate is permitted to give his version and to request the appearance of witnesses on his behalf.

f. After hearing the facts the superior officer makes a determination of the penalty to be assessed in the presence of the inmate.

Pending the hearing referred to above or prosecution by the district attorney, an inmate may be segregated by transfer to other tiers and, in some instances, to a single cell. At the time of such transfer the inmate is given no official notice that a violation has been alleged or that an investigation is in progress, and during this period of segregation the inmate is not permitted to meet or otherwise correspond with his former tier and cellmates, even if they may be potential witnesses on his behalf.

The inmate does not receive a written statement of the charges against him, and he is not notified in advance of his hearing. The stated basis for defendants' policy against advance notice of disciplinary hearings is that most serious offenses are committed by persons scheduled for release or transfer within 24 to 48 hours, that approximately 50% of the inmates received on any given day are released within 24 to 36 hours, and that once transferred or released, no discipline can be applied. Notice of a hearing scheduled for any particular day may be given at the 8:00 A.M. tier deputy shift change on that day, and definite hearing times are not scheduled but are held on a random "time available" basis because the jail staff are often totally committed to other regular duties given greater priority.

The superior officer who conducts the hearing and imposes the punishment may also have conducted the preliminary investigation. The sole stated reason that the hearing may be conducted by the investigating superior officer is lack of sufficient staff.

The inmate is not entitled to counsel or a counsel substitute, nor would privately obtained counsel be permitted to

participate in the hearing. The inmate is not given a copy of the charges against him nor is he given any of the statements or investigative reports. He is not permitted to cross-examine witnesses, no transcript or other written record is kept, and no written findings of fact or decision is made.

In instances of group misconduct, an entire tier may be disciplined for mass violations. Warnings are generally given the group, and, if the conduct continues, discipline may be imposed without hearings. Normal discipline is loss of privileges such as the following for periods of one or more days: television and radio, day room usage, and commissary.

Review of disciplinary decisions may be taken to the next higher level of authority, ending with the jailer. This review may be requested in writing after commencement of the punishment or by an oral request. The procedures followed on review are substantially identical to those at the initial stages. No transcript is kept nor is any written decision or findings of fact made. The inmates are not advised of their right to this hearing or review process.

Inmates are permitted to send an unlimited number of letters per day on stationery furnished by the jail, but each letter may not exceed two pages in length, whether written on one or two sheets. An inmate is permitted to write an unlimited number of letters to one addressee in the same day but each letter is limited to two pages and requires separate postage. The stated purpose of these restrictions is to discourage correspondence and to promote the convenience of the jail administration in censoring.

The jail requires that all incoming and outgoing mail be written in the English language. No correspondence with an individual (other than a spouse) in other penal institutions is permitted.

All incoming and outgoing mail, except privileged mail and attorney mail marked "confidential", is censored (i. e.

read) for matters relating to jail security. Incoming privileged mail and attorney mail marked "confidential" is opened in the presence of the addressee and inspected for contraband but not read. Outgoing privileged mail and attorney mail marked "confidential" is inspected for contraband in the presence of the sender but is not read, sealed in the envelope by the sender and mailed. Clearly identifiable attorney mail not marked "confidential" is censored. Inmates and attorneys are not notified that correspondence between them must be marked "confidential" to avoid censorship.

The defendants' stated purpose for the policy of censorship is the need to maintain the security of the jail, the jail officers, and the judiciary. Among the items of information censored are time and route of conveyance to court appearances, time and location of court appearances, information detailing the structure of the jail, plans of escape, plans for the introduction of contraband, intimidation of witnesses, or planning of new crimes. There is a substantial amount of movement of inmates to courts through corridors, elevators, and other public ways, and such movement presents an opportunity for planned escapes. Inmates make a great many court appearances, and these present opportunities for planned disturbances in the courtrooms.

The times and locations of court appearances are normally set at prior hearings and are matters of public record and knowledge. Inmate visits are not monitored and any of the information concerning court appearances could be passed at that time. Approximately 70% of the prisoners received in a given day are released within one week and 50% within 24 to 36 hours; such released individuals would have been housed throughout the jail and any of the information sought to be guarded through censorship could be taken out by these individuals when released.

The times and routes used by jail staff in conveying inmates to court appearances are according to well established procedures. When groups of inmates are being conveyed they are normally handcuffed together, and any escape attempt would have to involve the entire group. Leg shackles and chains are available and may be used depending upon the deputy's assessment of the security needs.

Quantities of paperback books, magazines, and other publications are supplied to the tiers on a weekly basis, and at the end of the week these reading materials are removed and replaced with others. The selection of reading materials any particular tier receives from available supplies is left solely to the discretion of the deputy handling the distribution. These are news stand returns of reading materials generally on sale throughout the Milwaukee area and are supplied to the jail at no cost by local distributors. All such reading material supplied by the jail is censored, and materials which in the judgment of the censor tend to be erotic in nature are not provided. There are no written standards governing this censorship, but rather it represents a staff consensus of what should or should not be permitted. The stated reason for this censorship is that such erotic materials would create sexual frustrations which might increase sexual assaults and homosexual behavior in the jail.

Inmates with sufficient funds may obtain additional reading materials if mailed to them directly by the publisher. Erotic materials from such sources are discouraged but not barred unless they "violate contemporary legal standards." An inmate might receive directly reading materials which would be otherwise excluded under the censorship procedures applied to jail-supplied material.

All incoming reading materials, except those provided by the jail, are limited to those mailed directly to inmates by publishing companies. Materials which are delivered or sent by friends or relatives are not admitted to the jail. The defendants' policy of permitting inmates to receive materials directly only from the publisher is rarely utilized, and the defendants' basis for such policy is that it eliminates the need to maintain staff to screen such materials for contraband such as narcotics, weapons and instruments used in escapes.

Immediately after his receipt at the jail, an inmate is entitled to call his lawyer or any other person, at any hour. Thereafter, telephone calls are permitted to counsel and bail bondsmen during regular business hours of 8:00 A.M. to 4:00 P.M. Calls to counsel and bondsmen may be made daily, but their frequency is at the discretion of the tier deputy, and such calls are often denied or limited as a result of requests made by the attorney or bondsman.

All requests to use the telephone must be made in writing and handed to the tier deputy. Requests for calls to persons such as parole and probation agents, clergy, and, in emergencies, members of the family are granted or denied at the discretion of the jailer. Calls to witnesses are not permitted, but it is in the discretion of a deputy to transmit a message to a witness or potential witness for the inmate. No social calls are permitted, and no incoming calls are permitted, but in emergency situations the deputy, in his discretion, may pass on a message to the inmate.

Prisoners are charged for calls, but if without funds the cost is borne by the sheriff's department. The calls are made from an extension phone plugged into a "phone jack" located on each tier. This "phone jack" is located in the guard's corridor at a distance from the day room to afford the caller some privacy. The extension is handed through the iron grill to the inmate who makes his call from the inmates' corridor. Once the call is placed, the inmate is not subject to close scrutiny or monitoring by the deputy, and, after the call is com-

pleted, the extension is retrieved by the deputy. The defendants' stated purpose for jail rules as to telephone usage is to prevent the passing on of the same information sought to be censored from letters and to conserve jail staff time.

## CONCLUSIONS OF LAW

Having described the existing facilities, policies and procedures of the jail, it is now necessary to examine such situation in light of constitutional requirements. The most difficult task, of course, is not the condemnation of those policies and procedures which fail to withstand such scrutiny, but the definition of those which will. In this regard, it must again be noted that this action was begun by and this decision pertains to those inmates detained because of inability to post bail. This case does not purport to raise issues with respect to Huber prisoners, trustees, sentenced prisoners awaiting trial on new local charges or sentenced prisoners awaiting transfers to other institutions.

A. Disciplinary Procedures

"Until and unless one is convicted of a crime, one shares with the general population the full latent protection of the Fourteenth Amendment." Morales v. Schmidt, 340 F.Supp. 544, 549 (W.D.Wis.1972).

■ The plaintiffs do not challenge the defendants' assertion that some form of disciplinary system may be applied to pretrial detainees in order to protect the security of the institution. Furthermore, there can be little doubt that measures designed to maintain reasonable order, safety and acceptable living conditions are encompassed within the concept of "security". The question is whether present disciplinary procedures satisfy minimal due process requirements. I find that, to a significant extent, they do not.

■ As a prerequisite to the imposition of any discipline, due process re-quires that a reasonable effort be made to inform inmates of conduct proscribed and the possible penalties flowing from violations. Cf. Lanzetta v. New Jersey, 306 U.S. 451, 453, 59 S.Ct. 618, 83 L.Ed. 888 (1939). Thus, clearly defined written rules and procedures must be posted or otherwise made available to all pretrial detainees. These rules and procedures need not be set forth with the formality of legislative enactments—indeed, legalisms should generally be avoided—rather, they should be presented in clear and simple language. With the exception of the rules concerning those topics which constitute the issues joined in this case, the present rules have not been challenged in this action either as to form or substance. The duty of the defendants, therefore, is basically one of codifying the rules and making them available to the inmates.

■ Slight deprivations of privileges for minor rule violations, as presently imposed, do not appear offensive. Inmates receive at least three written notices of described violations and an opportunity to discuss the matter with a superior officer before a decision is made concerning any loss of privileges. I do not believe that due process requires more.

■ I do believe, however, that various other punishments, such as the loss of any privileges for more than one day, isolation, reduced diet and loss of all privileges necessitate closer scrutiny. Regardless whether the violations involved are designated as minor or serious, punishments such as the ones just mentioned should not be imposed without complying with the requirements of Stewart v. Jozwiak, 346 F.Supp. 1062 (E.D.Wis.1972). *Stewart* outlined minimal due process requirements for disciplining sentenced prisoners, and, a fortiori, unconvicted detainees who face the possibility of significant discipline are entitled to at least as much. Therefore, before any of these more severe discipli-

nary measures may be directed, inmates are entitled to the following:

1. An impartial hearing officer who was not involved in the transaction and who has not participated in an investigation of the charges.
2. Reasonable advance oral or written notice of such hearing.
3. A general written description of the charges, given to the inmate a reasonable time prior to the hearing.
4. The right to present witnesses at the hearing.
5. The right to confront and question his accusers.
6. A short, written statement of conclusions composed by the hearing officer and given to the inmate.

■ What is contemplated here is "an effective but informal hearing." Morrissey v. Brewer, 408 U.S. 471, 485, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972). The plaintiffs assert that representation by counsel or counsel substitute should be declared an essential element of such a hearing on the basis of Argersinger v. Hamlin, 407 U.S. 25, 92 S.Ct. 2006, 32 L.Ed.2d 530 (1972), and Lessard v. Schmidt, 349 F.Supp. 1078 (E.D.Wis., decided October 18, 1972). (Three-judge court). I am not convinced. *Argersinger* and *Lessard* deal with the right to counsel prior to imprisonment for crime or involuntary commitment for mental illness. The law does not require the same high degree of formal representation in the case of one who is already detained and is being subjected to administrative disciplinary proceedings. See Jones v. Robinson, 142 U.S. App.D.C. 221, 440 F.2d 249, 252 (1971). Cf. Morrissey v. Brewer, *supra*, 408 U.S. at 480, 92 S.Ct. 2593.

■ In those serious violation cases which result in reference to the district attorney with a request for criminal prosecution, no administrative disciplinary action may be taken whether or not the district attorney acts on the request; inmates should not be subjected to the possibility of dual punishment for any one violation.

■ Nothing herein should be understood to preclude immediate action in emergency situations. Isolation, for example, may ordinarily not be imposed as a disciplinary measure without complying with the *Stewart* requirements; however, an inmate may be segregated from the general population pending a *Stewart* hearing or a criminal prosecution by the district attorney if such segregation is clearly needed to protect the order or safety of the institution.

B. Mail Restrictions and Censorship

■ The use of the mails is a first amendment right, retained, at least in some degree, even by sentenced prisoners. Nolan v. Fitzpatrick, 451 F.2d 545 (1st Cir. 1971); Morales v. Schmidt, 340 F.Supp. 544, 554–555 (W.D.Wis.1972). While this circuit has recently indicated a reluctance to examine aspects of *prison* administration regulating use of the mails under normal circumstances, Ferries v. Picket, Case No. 71–1883 (7th Cir., decided November 9, 1972), I do not believe that the latter view is applicable to pretrial detainees. Since such detainees are presumed innocent of the charges as to which they are being detained, they retain the right to send or receive mail in the same fashion as other members of the general public, subject only to limited restrictions. The most prominent restriction is that which is necessary for the preservation of jail security.

■ The defendants have failed to demonstrate any security interest in censoring inmate mail or in restricting the length of letters. Information concerning court dates, transportation routes to court and the physical characteristics of the jail can be acquired from public records, observation or communi-

cation with a sizeable number of people outside the jail. Such information is neither privileged nor secret and cannot be relied on as justification for mail censorship.

Similarly, the fear of threats being communicated to witnesses does not justify censorship. A person who has been released on bail not only can make threats without hindrance, but also he is in a better position to carry them out. However, the state may not refuse bail nor, in my opinion, conduct routine mail censorship because of this possibility.

 If ordinary correspondence on the part of pretrial detainees is protected from censorship as to the written content, it follows, by even stronger force, that correspondence with attorneys and court officials should not be screened. The defendants have failed to demonstrate any interest in inspecting such mail. I have been shown no reason why inmates should not be able to send and receive such correspondence in a sealed condition without interference, whether or not marked "privileged". See Marsh v. Moore, 325 F.Supp. 392, 395 (D.Mass.1971).

As to correspondence between inmates and others, I believe limited inspections for contraband are permissible. Preservation of the reasonable order and safety of the institution justifies inspection of such mail in accordance with the procedures outlined in Brown v. Schubert, 347 F.Supp. 1232, 1234 (E.D.Wis.1972). There the defendants were precluded

" . . . from censoring or interfering in any other way with said plaintiffs' correspondence, except that the right to inspect mail for contraband shall not be abrogated; such inspection may only be accomplished, however, through visual and manual examination of the envelopes, boxes and other containers in which correspondence is received or intended to be sent, and such examination must be performed in the prisoners' presence."

Thus, it is the court's conclusion that no mail restrictions are appropriate in regard to correspondence with counsel or court officers. As to others, limited restrictions are permissible, as outlined above, in regard to inspections for contraband. In all other respects, it is difficult to conceive of many circumstances which would justify denying to an inmate's mail the same full protections which are granted to any other citizen's mail. Theoretically, a situation could arise which would warrant some interference; for example, if an inmate decided to engage in a mail-order business which would provoke an avalanche of mail, the jail authorities could impose limitations for administrative reasons.

 If jail administrators have reason to believe that an inmate is using the mails to aid in the perpetration of a crime, that information should be turned over to the appropriate investigative agency. If that agency believes a showing of probable cause can be made, it is free to pursue any course consistent with the fourth amendment, just as with any other citizen. *See* Palmigiano v. Travisono, 317 F.Supp. 776, 791–792 (D.R.I.1970).

### C. Published Materials

Under present rules, books, periodicals and newspapers and other published material enter the jail from two sources: They are supplied by the administration or they are sent directly from the publisher to the inmate. The latter method is rarely accomplished because of the short detention that applies to most inmates. Also, it normally takes a rather lengthy period to establish or change a subscription address. The jailer acknowledged at trial that the direct mail restriction was designed to limit incoming materials and thereby ease the burden of inspection for contraband.

 The defendants have failed to demonstrate a sufficient justification for such a curtailment of first amend-

ment rights. Pretrial detainees have an unqualified right to read any publication which is legally available to members of the public generally. The defendants' subscription-only rule unduly interferes with that right. Detainees should not be denied the right to receive such publications, through the mail or from any source. Consistent with the prior portion of this opinion concerning inspection of mail, published materials may be examined to see if they are or contain contraband.

 Published materials may be designated as contraband only if they are found to be obscene under the strict standards enunciated by the United States Supreme Court or otherwise not entitled to first amendment protection. Palmigiano v. Travisono, 317 F.Supp. 776, 790 (D.R.I.1970).

The defendants have suggested that a restrictive approach to admission of erotic materials is appropriate for a detention facility in order to avoid stimuli for homosexual attacks and other illicit sexual conduct. However, they offered no credible testimony or documentation in support of the assertion that material may be entitled to constitutional protection but still pose a threat to institutional security. I conclude that the defendants have not supported their retention of rules which would proscribe the detainees' first amendment rights. The jailer is generally not obliged to purchase or furnish reading materials which he considers detrimental to jail security, absent unusual circumstances. But see Pitts v. Knowles, 339 F.Supp. 1183 (W.D.Wis.1972). However, in determining whether publications received by the prisoner from other sources may be treated as contraband, the jailer must be guided by the Supreme Court defini-

tions referred to above regarding obscenity. In case of doubt, the jailer should not circumscribe the detainee's first amendment rights.

D. Telephone Usage

 I find no constitutional difficulties with respect to telephone usage. Telephone calls to bondsmen and attorneys are allowed at the time of arrest and during business hours. Calls to others are allowed at the time of arrest or upon emergency application. No calls are monitored. Although jail personnel are given considerable authority with regard to the number of calls allowed and to the approval of emergency requests, there is no claim that such discretion is being abused. The physical limitations of the jail itself and the problems of accommodating large numbers of inmates utilizing the telephone make a more liberal telephone policy unrealistic.

In light of the previous ruling in this decision with regard to mailing privileges, the telephone restrictions become somewhat less serious. As long as inmates are allowed to communicate freely through the mails, the limitation of telephone availability for calls to attorneys, bondsmen and for emergency matters is not unlawful, absent a showing of abuse.

### CONCLUSION

I find that the policies and procedures presently in effect at the Milwaukee County jail offend the first and fourteenth amendments to the United States Constitution in the areas and to the degree set forth in earlier portions of this decision. Injunctive relief would be appropriate but for the fact that class action treatment was earlier denied, and I have been advised that the named plaintiffs herein are no longer subject to the detention which gave rise to this action.