Charles W. **MABRA**, Individually and on behalf of all others similarly situated, Plaintiff,

v.

Wilbur J. **SCHMIDT**, Secretary of the Department of Health and Social Services of the State of Wisconsin, et al., Defendants.

No. 72–C–392.

United States District Court,
W. D. Wisconsin.

April 23, 1973.

Charles W. Mabra, pro se.

Robert Warren, Atty. Gen., by Michael R. Klos, Asst. Atty. Gen., Madison, Wis., for defendants.

## OPINION AND ORDER

JAMES E. DOYLE, District Judge.

This is a civil action for monetary, declaratory, and injunctive relief. Jurisdiction is present. 42 U.S.C. § 1983; 28 U.S.C. § 1343(3).

The *pro se* complaint alleges that plaintiff is presently confined in the Wisconsin State Prison; that each of the defendants is a correctional official with certain powers and duties bearing on the administration of the prison; that on September 22, 1972, plaintiff was confined in the segregation building on an allegation that he had used abrasive language to a security officer supervising the visiting room; that he remained in such confinement in the segregation building on September 24, 1972, and October 2, 1972, on each of which dates his wife came to the prison to visit the plaintiff and brought to the prison, for the purpose of a visit, plaintiff's two year old child and his three year old child; that on each occasion, the said children were prevented by one or more of the defendants from visiting him; that on October 2, 1972, plaintiff made a written request for information about the Rules governing visits to persons confined in the segregation building; that by letter dated October 4, 1972, the defendant associate warden for security informed plaintiff that "We do not permit anyone under the age of 18 to visit inmates in the Segregation Building"; and that the said letter contained no further explanation.

Defendants have moved to dismiss the complaint for failure to state a claim upon which relief can be granted. It is this motion which is presently to be decided.

The brief in support of the motion asserts that the prison is a maximum security institution; that the segregation building is primarily designed for punitive detention of inmates who have demonstrated aggressive, unruly, uncooperative, and sometimes violent behavior; that the prison provides frequent opportunities for inmate visits with wife and family; that the prohibition against visitation by minor children applies only to the segregation building; that the plaintiff is in segregation because of his own misconduct; and that if plaintiff obeys prison regulations, he will be readmitted to the general inmate population, and will be allowed to visit with his minor children on the appointed days. Defendants' attorney concludes that the segregation building "is patently not a place where children should be allowed to visit," and that the challenged prison policy is reasonable on its face.

■ It may be that by the exercise of judicial notice, I can find that the prison is a maximum security institution, although this would be a doubtful judicial practice. Also, I may take as true the allegation of the complaint that plaintiff's confinement in the segregation building resulted from "an alleged disciplinary infraction," but not the contention of defendants' counsel that the misconduct did occur. None of the remaining factual allegations of defendants' brief may be accepted for the purpose of this motion to dismiss.

## The Case of Morales v. Schmidt

Morales v. Schmidt, 340 F.Supp. 544 (W.D.Wis.1972), was an action brought by a state prisoner who had been prevented for certain reasons from corresponding with his wife's sister. He challenged this prohibition on federal constitutional grounds. On a motion by the defendant correctional official for summary judgment, and on the plaintiff-prisoner's motion for a preliminary

injunction, I administered the lawsuit in the following manner:

> I considered that the state had classified persons into groups consisting of those who have been convicted of crime and those who have not been convicted of crime and that it had then proceeded to treat the two groups differently. I decided that this classification between those convicted of crime and those not convicted of crime is not inherently and generally "suspect," as classifications on the basis of race or religion, for example, are thought to be. I considered that the particular individual interest involved in the specific differential in treatment was freedom to correspond by mail with persons of one's choice. I determined that this individual interest is fundamental. I determined that since the differential in treatment of the two classes bore upon a fundamental individual interest, the burden was to be placed initially by the court upon the defendant official to justify the differential in treatment, and that the justification required was a showing that there was a compelling governmental interest in the differential in treatment.

I concluded that the defendant official had not yet met this burden in the lawsuit and that denial of his motion for summary judgment was required. I also concluded that the plaintiff's chance for ultimate success was sufficiently good, and the injury to him sufficiently serious and irreparable, to support a preliminary injunction.

On appeal, my decision was reversed. Morales v. Schmidt, No. 72–1373, 7th Cir., January 17, 1973. The decision of the Court of Appeals appears to turn upon dicta in Morrissey v. Brewer, 408 U.S. 471, 480, 483, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972), to the effect that conviction of a crime justifies imposing extensive restrictions on the liberty of the convict. The Court of Appeals stated (slip opinion, page 11):

> "The *Morrissey* Court did not pass on the constitutionality of the restrictions placed on parolees; however, in describing the 'traditional' conditions of parole, including the prohibition of association or correspondence with certain categories of undesirable persons, the Court implicitly acknowledged the propriety of these conditions or, at least, the authority of the States to limit a parolee's activities substantially beyond the ordinary restrictions imposed by law on an individual citizen. As we suggested before, the Constitution gives the States considerable leeway in deciding how to treat persons convicted of violating State law. We hold that the Constitution does not require a State to show a compelling interest when it seeks to restrict a prisoner's or parolee's associations or written communications with persons who are not judges, lawyers, or governmental officials. (See footnote 6, *supra*.)" [1]

Rather, the Court held:

> "The appropriate standard by which to judge the constitutionality of the kind of restriction the defendant wishes to impose in this case is the usual one for analyzing State action, namely, whether the action contemplated bears a rational relationship to or is reasonably necessary for the advancement of a justifiable purpose of the State."

The case was remanded to this court for further proceedings in which the "rational relationship" or "reasonably necessary" test is to be applied.

Of course, I am bound by the rule enunciated in *Morales* by the Court of Appeals, in cases to which it fairly ap-

---

[1]. In its footnote 6, without expressing its own opinion, the Court of Appeals referred to decisions by other courts in prisoner cases which may have involved freedom of the press; the public's right to know; communications with lawyers, courts, or state officials; censor's deletion of portions of mail; limitations on numbers of letters permitted to a prisoner; and restrictions on communications in retaliation for prisoner's engaging in protected activity.

plies. With respect, I observe that it has proved difficult to discern the true meaning and scope of the rule. In this *Mabra* opinion, I propose to comment generally on this difficulty; then to proceed to decide tentatively the pending motion in this *Mabra* case as if *Morales* had never been decided either in this court or in the Court of Appeals; and, finally, to inquire whether such a tentative decision on the motion in *Mabra* must be modified in light of the decision of the Court of Appeals in *Morales*.

### General Comment

It is familiar and obvious that litigation is affected importantly by the court's recognition or non-recognition of certain presumptions, by the allocation of the burden of persuasion, and by the court's definition of the nature of the burden of persuasion. This is as true of constitutional civil litigation as of other civil litigation; perhaps more so.

When a person believes that a certain right is secured by the Constitution of the United States and that a certain state official has deprived the person of this right, the aggrieved party may seek relief from a court in a civil suit against the state official. There are rules which determine how the trial court is to administer such a lawsuit: whether certain presumptions are to be recognized; to which party the court is to assign the burden of persuasion; and in what manner the court is to define the burden of persuasion.

 My understanding has been that in such federal constitutional civil litigation, generally, the trial court is to recognize a presumption that there is sufficient reason for the challenged statute, regulation, or practice.[2] Having recognized this presumption, the court is obliged to allocate to the plaintiff-chal-

lenger the burden of persuasion. Thus, the presumption is a device for administering the judicial inquiry; the validity of the statute, regulation, or practice always depends upon the existence of a sufficient reason for it; but, generally, when the challenge is made in court, the court will turn initially to the plaintiff-challenger to show, as it is sometimes expressed, that the statute, regulation, or practice bears no rational relationship to, and is not reasonably necessary for, the advancement of a justifiable purpose of the state.

However, in some federal constitutional civil litigation, I understand that the trial court is required to administer the lawsuit much differently.

██ For example, when a statute, regulation, or practice is challenged under the equal protection clause of the Fourteenth Amendment, the trial court is required initially to determine whether the challenged classification is generally and inherently "suspect," as classifications based on race have been held to be. If not, then the trial court is required to determine whether the particular individual interest affected by the differential in treatment is "fundamental." If the classification is inherently suspect, or if the particular individual interest affected is fundamental, the court is required to refrain from recognizing any presumption that sufficient reason exists for the differential in treatment. The court is required to allocate to the defender of the statute, regulation, or practice the burden of persuasion. The court is required to define that burden of persuasion in this manner: that the defendant must show that there is a compelling governmental interest in effectuating the differential in treatment, and that the particular differential in treatment is narrowly de-

---

2. I have much doubt whether the general presumption of validity which attends legislative enactments and regulations promulgated by administrative agencies pursuant to reasonably clear legislative guidelines, should attend in full force *ad hoc* actions by administrative officials

who act without the benefit or the constraint of intelligible legislative direction. See the dissenting opinion of Judge Stevens in Morales v. Schmidt, slip opinion, pp. 21–22. However, I do not press the distinction for present purposes.

signed to effectuate this compelling governmental interest.

■■ Also, when a statute, regulation, or practice is challenged under the due process clause of the Fourteenth Amendment, the trial court is required initially to determine whether the particular individual interest limited or denied is fundamental. If so, the court is required to refrain from recognizing any presumption that sufficient reason exists for the limitation or denial; to allocate to the defender the burden of persuasion; and to define the burden of persuasion in this manner: that the defendant must show that there is a compelling governmental interest in effectuating the limitation or denial of the individual interest, and that the particular limitation or denial is narrowly designed to effectuate this compelling governmental interest.[3]

■ In Morales v. Schmidt, I intended to assert a simple proposition: that in administering constitutional civil litigation, the federal courts, as instruments of government, are bound by the guarantee of equal protection embodied in the due process clause of the Fifth Amendment.[4] The federal courts are bound to honor the same set of rules in recognizing or declining to recognize a presumption of validity, in allocating the burden of persuasion to the challenger or to the defender, and in defining the nature of the burden, whether the plaintiff-challenger is white, black, poor, rich, young, old, female, male, Protestant or Jew, whether the defendant is a school board, a city attorney, a police chief, a parking authority, or a utilities commission, and whether the subject matter of the challenged statute, regulation, or practice is duration of residence, public employment, voting, welfare payments, or pornography. I find nothing in the Constitution, nor any consideration of equal protection, to require or to permit the federal courts to apply a different set of rules as to the existence of a presumption, the allocation of the burden, or the definition of the burden, simply because the plaintiff is a person who has been convicted of a crime, the defendant is a state correctional official, and the challenged statute, regulation, or practice is a correctional measure. Nor do I find anything in the decisions of the Supreme Court of the United States to require or to permit the courts to apply one set of rules to federal constitutional civil litigation involving correctional statutes, regulations and practices, and to apply a wholly different set of rules to all other federal constitutional civil litigation. Indeed, the Court has expressed rather clearly the view that the federal courts are to administer constitutional litigation initiated by "persons" who are prisoners just as they are to administer constitutional litigation initiated by "persons" who are not prisoners. See Cruz v. Beto, 405 U.S. 319, 321, 92 S.Ct. 1079, 31 L.Ed.2d 263 (1972). For example, the Court has flatly held that "State prisoners are not held to any stricter standard of exhaustion [of state remedies in § 1983 cases] than other civil rights plaintiffs. Houghton v.

---

3. Whether in the context of equal protection issues or due process issues, these concepts are variously expressed in the cases. See Hunter v. Erikson, 393 U.S. 385, 391, 89 S.Ct. 557, 21 L.Ed.2d 616 (1968); McLaughlin v. Florida, 379 U.S. 184, 191–192, 85 S.Ct. 283, 13 L.Ed.2d 222 (1964); Roe v. Wade, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973).

4. "[W]hile the Fifth Amendment contains no equal protection clause, it does forbid discrimination that is 'so unjustifiable as to be violative of due process.' Bolling v.

Sharpe, 347 U.S. 497, 499, 74 S.Ct. 693, 98 L.Ed. 884." Schneider v. Rusk, 377 U.S. 163, 168, 84 S.Ct. 1187, 1190, 12 L.Ed.2d 218 (1964). See Shapiro v. Thompson, 394 U.S. 618, 641–642, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969). See, also, Cruz v. Hauck, 404 U.S. 59, 92 S.Ct. 313, 30 L.Ed.2d 217 (1971) (Justice Douglas, concurring). (If an action under 42 U.S.C. § 1983 were to be brought in a state court, the administration of the suit there would be affected directly by the explicit equal protection guarantee of the Fourteenth Amendment.)

Shafer, 392 U.S. 639, 88 S.Ct. 2119, 20 L.Ed.2d 1319 (1968)." Wilwording v. Swenson, 404 U.S. 249, 251–252, 92 S.Ct. 407, 409, 30 L.Ed.2d 418 (1971).

I appreciate that as time passes and constitutional law continues to develop, the presently prevailing judicial processes, techniques and approaches may give way to others. I appreciate that it may come to be thought that the system of suspect and non-suspect classifications, fundamental and non-fundamental individual interests, compelling and non-compelling governmental interests, triggering in the courts varying procedural responses and varying results on the merits, is too mechanistic. It may come to be thought that these adjudicative tools should be replaced by others more conducive to the growth of the law of due process and equal protection.[5] But I suggest that the enduring principle should be that whatever set of adjudicative tools the courts may be required to employ during any given period of time, the tools should be employed evenhandedly.

Although in *Morales* I intended to assert the thesis I have stated here, I believe now that I failed to state it clearly, probably because I did not perceive it clearly. I now perceive that my primary and initial emphasis in *Morales* should have been on the operations of the federal courts as instruments of government: that is, that the guarantee of equal protection requires that § 1983 lawsuits commenced by persons convicted of crime to challenge the constitutionality of various correctional statutes, regulations or practices, should be administered by the courts by applying the same judicial processes, techniques and approaches as those the courts apply in administering § 1983 lawsuits commenced by persons not convicted of crime to challenge the constitutionality of statutes, regulations or practices involving subjects other than corrections. I then should have made clear that I proposed to proceed to practice in the

*Morales* case what I had just preached about the duty of the federal courts in administering § 1983 actions generally. I should then have proceeded to practice what I had preached. In this manner, the steps by which I reached my ultimate decision would have been more clearly exposed.

In any event, the critical problem presently is to discern exactly what the Court of Appeals did when it reviewed *Morales*. Three alternative constructions of the decision of the Court of Appeals suggest themselves:

(1) The Court of Appeals may have agreed that § 1983 actions brought by persons convicted of crime to challenge correctional measures should be administered by the courts just as the courts administer § 1983 actions brought by persons not convicted of crime to challenge non-correctional measures. It may then have examined the individual interest of Morales which was at stake, namely, freedom to communicate with persons of his choice, and it may have concluded, implicitly, that this individual interest falls within a non-fundamental category rather than a fundamental category. It may then have concluded that the burden of persuasion was to be allocated to the plaintiff-challenger, and that the burden was to show the absence of any rational relationship between the challenged measure and a justifiable state purpose and the absence of any reasonable necessity for the challenged measure in relation to a justifiable state purpose.

(2) The Court of Appeals may have disagreed with the proposition that § 1983 actions brought by persons convicted of crime to challenge correctional measures should be administered by the courts just as the courts adminis-

5. See Gunther, The Supreme Court-Forward, 86 Harv.L.Rev. 1 (1972).

ter § 1983 actions brought by persons not convicted of crime to challenge non-correctional measures. The court may have improvised a special rule for actions challenging correctional measures. It may have improvised a special rule that in such cases only, the courts are initially to examine the individual interest at stake and consign it not simply to one of two categories (fundamental or non-fundamental) but rather to one of three categories which might be labeled: ordinary, intermediate, or fundamental.[6] It may then have improvised a further rule that if the individual interest at stake falls within the intermediate category, the court is to allocate the burden of persuasion to the defender[7] of the correctional measure (as it would if the individual interest at stake were fundamental) but that the nature of the burden is simply to show the existence of a rational relationship or reasonable necessity (as would be the case if the individual interest at stake were ordinary).

(3) The Court of Appeals may have disagreed with the proposition that § 1983 actions brought by persons convicted of crime to challenge correctional measures should be administered by the courts just as the courts administer § 1983 actions brought by persons not convicted of crime to challenge non-correctional measures. The court may have agreed that, in keeping with the usual rule, the courts are initially to examine the individual interest at stake and consign it to one of two categories: fundamental or non-fundamental. However, it may have improvised a special rule for actions challenging correctional measures: that the category of fundamental individual interests is then to be divided into two sub-categories, as yet undefined, to which I will refer as (a) and (b). When a § 1983 action is brought to challenge a correctional measure which limits or denies a fundamental individual interest in category (a), the court is to allocate to the defender the burden of showing a compelling governmental interest in

6. The Court of Appeals may have intended that in § 1983 cases challenging correctional measures:
(a) fundamental individual interests include the opportunity to communicate in writing with judges, lawyers, and governmental officials, and possibly also one or more of the rights referred to in footnote 6 of its opinion (the right to communicate with the press, the right not to have one's mail opened and read, the right not to have certain sentences deleted from one's mail by a censor, the right not to have the number of one's letters limited, or the right not to have one's correspondence restricted in retaliation for engaging in protected activity);
(b) intermediate individual interests include the opportunity to communicate with a sister-in-law in the circumstances present in the *Morales* case; and
(c) ordinary individual interests include all those not included in (a) and (b).

7. The Court of Appeals did not explicitly hold that this burden of persuasion is to be allocated to the defender of the challenged measure, but its language makes this quite clear. The court stated that, pursuant to the rational relationship standard or the reasonable necessity standard, "a district court should scrutinize closely the justifications offered by the State for the limitation. Its review must 'be more than an obeisance to a warden's asserted expertise.' Spaeth, The Courts' Responsibility for Prison Reform, 16 Vill.L.Rev. 1029, 1031, 1937 (1971)." (Slip opinion, page 12.) Also, in commenting favorably upon a recent opinion of the Wisconsin Supreme Court in a prisoner case, the Court of Appeals observed that "the [Wisconsin Supreme Court's] primary aim was to emphasize the State's obligation to justify its actions under any of the accepted standards of review. . . ." (Slip opinion, page 13.)

the limitation or denial. When a § 1983 action is brought to challenge a correctional measure which limits or denies a fundamental individual interest in category (b), the court is to allocate to the defender [8] the burden of showing only a rational relationship or a reasonable necessity.[9]

It is tempting to adopt the first of these three alternative constructions. Such a construction would preserve what I regard as the basic proposition: that § 1983 actions commenced by persons convicted of crime to challenge correctional measures are not to be administered by the courts according to some unique improvisation. However, such a construction would require me to conclude that, faced with a need to decide whether Morales' individual interest in communicating with a person of his choice was fundamental or non-fundamental, the court concluded that it was non-fundamental. On at least three occasions in its opinion, the court referred to my conclusion that the particular individual interest of Morales at stake was a fundamental First Amendment freedom, but it pointedly refrained from stating whether it agreed or disagreed. In the absence of an express declaration, I cannot conclude that the Court of Appeals regards as non-fundamental so important an individual interest as the right to correspond with persons of one's choice. Also, I cannot conclude that the Court of Appeals could consider the individual interest in corresponding with persons of one's choice to be less important, less intense, less fundamental to a person convicted of crime than to a person not convicted of crime. I conclude that the Court of Appeals must have considered that the individual interest of

Morales at stake was indeed fundamental. However, since the court did not accept the consequence which should flow from such a determination, namely, that the compelling governmental interest test must be applied, it follows that either the second or the third construction of its opinion, set forth above, must be accepted.

The second and third constructions may come to the same thing. But since there is no language in the opinion which suggests that the Court of Appeals was consciously abandoning a familiar two-category approach (fundamental and non-fundamental individual interests) in favor of a new three-category approach (ordinary, intermediate, and fundamental individual interests), I have concluded that the third construction must be accepted. It means that in each § 1983 action commenced by a person convicted of crime to challenge a correctional measure, the trial court must determine initially whether the particular individual interest at stake is fundamental. If so, the trial court must proceed further to determine into which subcategory of fundamental individual interests it falls. Because the rationale for this latter subclassification has not yet been articulated by the Court of Appeals, the task will be difficult to perform.

I sense that the thesis I advanced in *Morales* and have restated here evokes a degree of anxiety about its consequences. I offer a few comments on this reaction. I believe that challenges to the correctional system in the form of § 1983 suits reflect a ferment in the society. The ferment may ebb, but it is unlikely that the probing lawsuits will subside for some time to come. The courts are not likely to escape the neces-

8. See footnote 7, *supra*.

9. The Court of Appeals may have intended that in § 1983 cases challenging correctional measures, the category of fundamental individual interests should be divided into one sub-category which would include those opportunities and rights I have referred to in part (a) of footnote 6, *supra*, and a second sub-category which would include those I have referred to in part (b) of footnote 6, *supra*. It may have intended that the category of non-fundamental individual interests would include all those I have referred to in part (c) of footnote 6, *supra*.

sity to entertain and to decide many such challenges. I agree that the courts' response should be careful and deliberate. I agree that flexibility, adaptability, elbow room for evolution in correctional practices and in constitutional doctrine must be preserved. This is why I have stressed only that the adjudicative processes, techniques, and approaches should be administered evenhandedly by the courts, not that the results should be uniform. When correctional measures limit or restrict non-fundamental individual interests, I see flexibility in the terms "rationally related," "reasonably necessary," and "justifiable state purposes." When correctional measures limit or restrict fundamental individual interests, I see flexibility in the term "compelling governmental interest." In litigation involving the constitutionality of governmental measures other than correctional measures, these terms are currently thought to provide sufficient elbow room. Neither prudent caution in a newly developing field of constitutional law, nor a laudable desire to preserve flexibility, seems to require or suggest the improvisation of a new set of adjudicative processes, techniques and approaches, apparently intended uniquely to guide the courts in administering constitutional challenges to correctional measures, as contrasted with challenges to all other governmental measures. But this is the course upon which the Court of Appeals seems to have embarked in *Morales*.

Perhaps the deepest anxiety abroad is that the present correctional system may not survive a course of constitutional litigation in which its specific elements are subjected even to the mild "rationally related" or "reasonably necessary" tests, and that many of its specific elements cannot meet the more severe test of a "compelling governmental interest." Historically, the courts have surely been disposed to preserve the correctional system. If the past is prologue, the correctional authorities may find comfort in a prediction that many correctional measures will probably be upheld by many

courts in many lawsuits. Rational relationships, reasonable necessities, justifiable state purposes, compelling governmental interests will probably be discovered frequently. However, it would be idle to predict the ultimate pattern of judicial decision. Generations of dedicated, perceptive, civilized men and women have been struggling to develop, maintain, and improve our correctional programs. But in terms of constitutional scrutiny, theirs is a dark continent. I believe that the time has come in this corner of human experience, as it came much earlier in others, for the courts to mark with careful and deliberate firmness, the limits upon permissible governmental interference in the lives of the people. To the degree that the present correctional system cannot withstand this searching inquiry, it should be terminated, better soon than late.

### Tentative Decision in Mabra

Had *Morales* never been decided either in this court or in the Court of Appeals, my decision on the pending motion in this *Mabra* case would have been as set forth in this section of this opinion.

#### (a) Due Process

Freedom to associate with others is a right secured by the First and Fourteenth Amendments. N.A.A.C.P. v. Alabama, 357 U.S. 449, 462, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1957). The forms of association protected by the Fourteenth Amendment are not limited to those which are "political in the customary sense," but include those which "pertain to the social, legal, and economic benefit of the members." Griswold v. Connecticut, 381 U.S. 479, 483, 85 S.Ct. 1678, 1681, 14 L.Ed.2d 510 (1965). Specifically, constitutionally protected associations include that between wife and husband. *Griswold*, at 486, 85 S.Ct. 1678.

In Roe v. Wade, 410 U.S. 113, 152, 93 S.Ct. 705, 726, 35 L.Ed.2d 147 (1973), in the context of a discussion of the constitutional guarantee of personal privacy,

the Supreme Court of the United States observed that included within this guarantee are "only personal rights that can be deemed 'fundamental' or 'implicit in the concept of ordered liberty,' Palko v. Connecticut, 302 U.S. 319, 325, 58 S.Ct. 149, 82 L.Ed. 288 (1937)," and added that the right of personal privacy "has some extension to activities relating to . . . family relationships, Prince v. Massachusetts, 321 U.S. 158, 166, 64 S. Ct. 438, 442, 88 L.Ed. 645 (1944), and child rearing and education, Pierce v. Society of Sisters, 268 U.S. 510, 535, 45 S.Ct. 571, 69 L.Ed. 1070 (1925), Meyer v. Nebraska, [262 U.S. 390, 399, 43 S.Ct. 625, 67 L.Ed. 1042 (1923)]."

■ I conclude that a father enjoys a right to associate with his children; that this right is guaranteed by the First Amendment as incorporated in the Fourteenth; alternatively, that this right is embodied in the concept of "liberty" as that word is used in the due process clause of the Fourteenth Amendment; and that, whatever the constitutional provision or provisions by which it is protected, the right is fundamental.

In Roe v. Wade, the Supreme Court emphatically reaffirmed 410 U.S., at 155, 93 S.Ct. 705 at 728) that governmental regulation limiting fundamental rights of individuals may be justified only by a "compelling state interest" and that such "legislative enactments [Roe v. Wade involved statutes only, not administrative regulations or action] must be narrowly drawn to express only the legitimate state interests at stake." The holding in the case was that the state's interest in the health of a pregnant woman becomes "compelling" at a certain state of a pregnancy, and not earlier, and that the state's interest in the potential life becomes "compelling" at a certain stage of pregnancy, and not earlier.

Because I have concluded that the interest of the plaintiff Mabra in associating with his children is a fundamental individual interest, I recognize no presumption that sufficient reason exists for the defendants' denial of that interest. I allocate to the defendant officials the burden of persuasion. I define that burden in this way: that the defendant officials must show that there is a compelling governmental interest in the challenged regulation or practice, and that the challenged regulation or practice is narrowly designed to effectuate this compelling governmental interest.

■ On a motion to dismiss, the defendants' "showing" is limited to the allegations of the complaint. From those allegations and from inferences clearly to be drawn from those allegations, defendants have shown that the plaintiff was convicted of a crime and confined in the prison; that while so confined, he was accused of using abrasive language to a security officer; that as a result, he was confined in the segregation building within the prison; and that he was denied the opportunity to be with his two year old child and his three year old child, because no one under the age of 18 is permitted to visit inmates confined in the segregation building. On this record, I conclude that the defendants have not shown the existence of a compelling governmental interest in the challenged regulation or practice. Assuming that a compelling governmental interest may exist, I conclude that the defendants have not shown that the challenged regulation or practice is sufficiently narrow.

In reaching this conclusion, I have excluded all equal protection considerations. I have viewed the plaintiff Mabra as an individual person in his relationship to the defendant officials. I have not viewed him as a member of that group of persons who have been convicted of crime; or a member of that sub-group of persons who have been convicted of crime and who have been committed to the state prison; or as a member of that sub-sub-group of persons who have been convicted of crime and who have been committed to the state prison and who have been confined in the segregation building within the prison.

## (b) *Equal Protection: Intra-Prison*

It appears from the allegations of the complaint, and inferences clearly to be drawn therefrom, that persons confined in the state prison generally may receive visits from their children under the age of 18, but that those persons confined in the segregation building may not receive such visits. This differential in treatment as between the two groups of prisoners bears upon the interest of an individual father in associating with his minor children. I have already concluded that this individual interest is fundamental.[10] Therefore, I decline to presume that sufficient reason exists for this differential in treatment. I allocate to the defendant officials the burden of persuasion. I define the burden in this manner: that the defendants must show a compelling governmental interest in this differential in the treatment of the two groups, and that they must show that the regulation or practice embodying this differential in treatment is narrowly designed to effectuate this compelling governmental interest. As explained above, I conclude that on the present record in this case, the defendants have made neither of these showings and that their motion to dismiss must be denied.

## (c) *Equal Protection: Those Convicted of Crime and Those Not Convicted of Crime*

It appears from the allegations of the complaint that the plaintiff is an inmate of the Wisconsin state prison. By the exercise of judicial notice of the laws of Wisconsin, I find that persons convicted of crime may be committed to the prison while persons not convicted of crime may not be committed to the prison. But for his conviction of crime, plaintiff would not be confined to the prison.

But for his confinement in the prison, plaintiff would not be confined in the segregation building within the prison. But for his confinement in the segregation building, plaintiff would be permitted to receive visits from his children under the age of 18. Therefore, the conviction of crime was the critical event which rendered the plaintiff vulnerable to what ensued, including the denial of the opportunity to receive visits from his children. I find that under the statutes, regulations, and practices of the state of Wisconsin, persons not convicted of crime are generally free to associate with their minor children. I have already concluded that this individual interest in association with one's minor children is fundamental.[11] Therefore, I decline to presume that sufficient reason exists for this particular differential in the treatment of the two groups: those who have been convicted of crime and those who have not. I allocate to the defendant officials the burden of persuasion. I define the burden in this manner: that the defendant officials must show a compelling governmental interest in this differential in the treatment of the two groups, and that they must show that the regulation or practice embodying this differential in treatment is narrowly designed to effectuate the compelling governmental interest. As explained above, I conclude that on the present record in this case, the defendants have made neither of these showings, and that their motion to dismiss must be denied.

### *Effect of Morales on My Tentative Decision in Mabra*

#### (a) *Due Process*

In my actual decision in *Morales*, 340 F.Supp. 544, 554–555, I employed an

---

10. Whether "fundamental" for the purpose of the application of the due process clause is exactly equivalent to "fundamental" for the purpose of the application of the equal protection clause is somewhat unclear. See San Antonio Independent School District v. Rodriguez, —— U.S. ——, ——, ——, ——, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973). Assuming that there may not be a total equivalence, I conclude explicitly that one's interest in associating with his minor children is fundamental with respect to the due process clause and that it is also fundamental with respect to the equal protection clause.

11. See footnote 10, *supra.*

equal protection analysis, based upon a governmental classification of those convicted of crime and those not convicted of crime.[12] In reviewing my decision, the Court of Appeals appeared to consider the case wholly in terms of equal protection, and to reject my view that an application of an equal protection analysis to the particular individual interest at stake required that the defendant official show a compelling governmental interest in the particular differential in treatment.

It is possible that the opinion and order of the Court of Appeals in *Morales* leaves me free to employ the due process analysis here exactly as I have employed it in my tentative decision in this *Mabra* case. However, I must inquire whether the opinion of the Court of Appeals in *Morales* provides any clue that had it considered the case in the context of the due process clause of the Fourteenth Amendment, rather than the equal protection clause, it would have reached a different result. I am compelled to conclude that the result would have been the same. I am compelled to conclude that whether the challenge to the correctional measure is based upon the equal protection clause or the due process clause, the Court of Appeals intended that the trial court must determine initially whether the individual interest at stake is fundamental or non-fundamental. If the initial determination is that the individual interest is fundamental, the trial court must then determine whether the particular fundamental interest is in the sub-category which triggers the application of the compelling governmental interest test or in the sub-category which triggers the milder rationally related test or the reasonably necessary test.

Thus, I consider that in administering this *Mabra* case in terms of the due process clause of the Fourteenth Amendment, I am bound to proceed as directed by the Court of Appeals in *Morales* un-

less intervening decisions of the Court of Appeals or the Supreme Court of the United States free me from this bond. I am aware of no such intervening decision by the Court of Appeals. However, since the time at which the Court of Appeals decided *Morales*, there have been at least two decisions of the Supreme Court which may be relevant: Roe v. Wade, 410 U.S. 113, 93 S.Ct. 705, 35 L. Ed.2d 147 (1973), and San Antonio Independent School District v. Rodriguez, —— U.S. ——, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973).

It is difficult to see how the Supreme Court could have made more explicit than in Roe v. Wade that when a governmental measure is challenged on constitutional grounds, and when it is determined that the individual interest limited or denied by the challenged governmental measure is ."fundamental," there is to be allocated to the defender of the challenged measure the burden of showing that there is a compelling governmental interest in the limitation or denial and also that the particular limitation or denial is narrowly designed to effectuate this compelling governmental interest. It is significant, I think, that the Court engaged in no equal protection analysis. For example, the Court did not undertake to determine whether pregnant women as a class had been denied by a state government a certain measure of control over their bodies which had not been denied to other classes of persons. Rather, the court addressed itself directly to the particular individual interest involved (namely, a woman's freedom to decide whether to terminate her pregnancy), determined that this individual interest falls within the Fourteenth Amendment's concept of personal liberty, determined that the individual interest is fundamental, allocated to the defender of the restrictive measure the burden of persuasion, defined the burden severely, and decided the case.

12. In the opinion, however, I discussed briefly how my suggested approach might be employed in a due process analysis. 340 F.Supp., at 550–551.

The bearing of San Antonio Independent School District v. Rodriguez upon the issue at hand in *Morales* is somewhat more tangential, yet it significantly reenforces the bearing of Roe v. Wade. Although *San Antonio* is distinctly an equal protection case, rather than a due process case, the Supreme Court expressly accepted the necessity of determining whether an individual's interest in education is "fundamental," and expressly explained that this necessity arises because the validity of the alleged differential in treatment was to be measured by the milder rational relationship standard if the individual interest is not fundamental, but by "strict judicial scrutiny" if the individual interest is fundamental. —— U.S. ——, ——, 93 S.Ct. 1278. The Court determined that the individual interest in education is not fundamental, applied the mild test, and upheld the differential in treatment because it "rationally furthers a legitimate state purpose or interest." At ——, 93 S.Ct. at 1308.

At the time the Court of Appeals decided *Morales*, it was directing the trial courts in this circuit, in cases involving the validity of correctional measures, to depart from the judicial processes, techniques and approaches which the Supreme Court of the United States had approved for constitutional civil litigation generally. The question is whether the intervening decisions of the Supreme Court in Roe v. Wade and *San Antonio* free me from the Court of Appeals' directive. I must answer this question, no. Neither Roe v. Wade nor *San Antonio* involved a challenge to a correctional measure. Roe v. Wade and *San Antonio* are significant here. But their significance is only that they cause to stand in boldest relief the direction from the Court of Appeals that the trial courts are to administer in a unique manner those actions commenced under § 1983 by persons convicted of crime to challenge correctional measures.

In the tentative decision in *Mabra,* above, I have determined that one's right to associate with one's infant children is clearly within the liberty guaranteed by the due process clause of the Fourteenth Amendment, and that this individual interest is fundamental. Nothing in the decision of the Court of Appeals in *Morales* appears to compel that this determination be altered. Therefore, I must proceed to determine whether a restriction upon one's interest in associating with one's infant children falls within that category of restrictions upon fundamental individual interests which triggers the application of the compelling governmental interest test or within that category of restrictions upon fundamental interests which triggers the application of the more mild rational relationship test or reasonably necessary test. In performing this task, the underlying rationale of the Court of Appeals' decision in *Morales* is a possible source of guidance. Another is an examination of the specific restrictions which the Court of Appeals implied were examples of one category or the other.

The rationale of the Court of Appeals' decision appears to be as follows: dicta in Morrissey v. Brewer, 408 U.S. 471, 480, 483, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972), "implicitly acknowledged" that "'traditional' conditions of parole, including the prohibition of association or correspondence with certain categories of undesirable persons" were constitutionally permissible (Morales v. Schmidt, Slip opinion, page 11); therefore, with certain exceptions, when persons convicted of crime commence lawsuits challenging correctional restrictions upon fundamental individual interests, the courts are not to apply the compelling governmental interest test, but only a milder test. I agree, of course, that not only in Morrissey v. Brewer but in other cases, the Supreme Court has taken it for granted that woes may constitutionally befall those convicted of crime, and I agree that among inferior courts this attitude has been epidemic for decades. But from the fact that the courts generally have taken this for granted for many years, it follows in no way that when the validity of a particular correc-

tional measure is challenged in a lawsuit, the courts are to apply to it a mild test, or for that matter, that they are to apply to it a severe test. It seems unlikely that in deciding Morrissey v. Brewer, the Supreme Court had this question in mind. But if we are to assume that it did, the Supreme Court may have been expressing, rather expansively, the view that many correctional restrictions upon fundamental individual interests would indeed survive the application of the compelling governmental interest test.

Lacking guidance from the rationale of the decision of the Court of Appeals in *Morales*, I turn to the specific restrictions upon which that opinion commented and I attempt to relate them to the specific restriction involved in *Mabra*.

*Morales* involved a prohibition against written communications. *Mabra* involves a prohibition against association in the form of visits. Thus, strictly, *Morales* is dicta with respect to forms of association other than written communications. However, the opinion of the Court of Appeals lumps "a prisoner's or parolee's associations or written communications. . . ." Page 11. The Court clearly intended its rule to apply broadly to various forms of associations, not solely to written communications.

▬▬ However, in *Morales* the Court of Appeals strongly implied that correctional restrictions upon certain types of associations do trigger the application of the compelling governmental interest test. Apparently, these include restrictions upon communications between prisoners and parolees, on the one hand, and judges, lawyers, and governmental officials, on the other. Also, possibly, they

may include correctional restrictions which take the following forms: interference with the public's right to know; physically cutting out parts of letters; censors' reading of correspondence with approved communicants; and limitation of the number of letters to be exchanged with approved communicants. We know definitely, however, that the application of the compelling governmental interest test is not triggered by the correctional restriction challenged in *Morales*: namely, the prohibition of .written communications between the parolee and a woman who is his wife's sister and who is also believed to be the mother of an illegitimate child of the parolee. I must say that it seems unlikely that in *Morales* the Court of Appeals was actively contemplating the entire range of correctional measures which limit or deny the fundamental individual interests of those convicted of crime. Superficially, at least, a court's critical antennae are less likely to respond to a prohibition against correspondence between a man and his alleged illicit lover, than to a prohibition against visits between a man and his infant children. Yet, if strangers could come to understand every nuance of the human relationships involved, it might well be learned that in a particular situation the opportunity to communicate with the mother of one's illegitimate child is more important to many persons affected, more "fundamental," than the opportunity to be visited by one's legitimate infant children.[13] I confess the greatest difficulty in attempting to apply *Morales* to the specific restriction challenged in *Mabra*. However, I conclude that the denial of visits from one's infant children resembles more closely a denial of the opportunity to correspond with the mother of

13. Some may suggest that the obvious difficulty in making such subtle calibrations in sensitive human mechanisms reenforces the proposition that the courts should hold their hand. Quite the contrary, as it seems to me, the Constitution should be read by the courts to bar government (in the form of correctional authorities) from unsolicited intrusions into

such intimate theaters of life, at least in the absence of a truly compelling governmental interest. I say "unsolicited" because, of course, I see no constitutional problems in making available to those convicted of crime such guidance and counseling—vocational, psychiatric, or ethical—as they may elect to accept.

one's illegitimate child, than it resembles a denial of the opportunity to correspond with a judge, lawyer, or governmental official or a denial of the public's right to know.[14] I conclude that under the rule of the Court of Appeals in *Morales*, a denial of the opportunity to be visited by one's infant children does not trigger the application of the compelling governmental interest test.

 I conclude that in *Mabra* the burden rests upon the defendant officials to show that the denial of visits to the plaintiff by his infant children does not violate the due process clause of the Fourteenth Amendment because the denial is rationally related to, or reasonably necessary for, the advancement of a justifiable purpose of the state. I conclude that upon the basis of the complaint and the motion to dismiss for failure to state a claim upon which relief may be granted, the defendants have failed to make this showing, and that their motion to dismiss must be denied.

#### (b) *Equal Protection: Intra-Prison*

 I conclude that the defendants apply a differential in treatment as between prisoners confined in the segregation building and prisoners not so confined, with respect to one's individual interest in associating with one's infant children. I conclude that this individual interest is fundamental. I conclude that the burden is upon the defendants to show that this particular differential in treatment is rationally related to, or is reasonably necessary for, the advancement of a justifiable state purpose. I conclude that on the present record, the defendants have made no such showing, and that their motion to dismiss must be denied.

#### (c) *Equal Protection: Those Convicted of Crime and Those Not Convicted of Crime*

I conclude that the state, through the defendants, applies a differential in treatment as between those convicted of crime and those not convicted of crime, with respect to one's individual interest in associating with one's infant children. I conclude that this individual interest is fundamental. I conclude that the burden is upon the defendants to show that this particular differential in treatment is rationally related to, or is reasonably necessary for, the advancement of a justifiable state purpose. I conclude that on the present record, the defendants have made no such showing, and that their motion to dismiss must be denied.

---

14. I am unable to discern degrees of resemblance between a denial of visits by one's infant children, on the one hand, and, on the other, physically cutting out parts of letters, censors' reading of correspondence with approved communicants, or limitations on the number of letters to be exchanged with approved communicants.